IN THE TAX COURT OF THE
STATE OF OREGON

GRANT COUNTY ASSESSOR,
a political subdivision of
the State of Oregon
by and through its
Assessor and Tax Collector,
Lane L. Burton

*v.*

DEPARTMENT OF REVENUE
& D.R. Johnson Lumber Co.,
dba Prairie Wood Products

(TC 4031)

Timothy P. O'Rourke, Corey, Byler, Rew, Lorenzen & Hojem, L.L.P., Pendleton, represented Plaintiff (county).

David L. Canary, Garvery, Schubert & Barer, Portland, represented Defendant, D.R. Johnson Lumber Company (taxpayer).

James C. Wallace, Assistant Attorney General, Department of Justice, Salem, filed an answer for defendant Department of Revenue (department) but did not further argue the cause.

Decision for Plaintiff rendered May 13, 1998.

### CARL N. BYERS, Judge.

Taxpayer, D.R. Johnson Lumber Company, for tax year 1994-95 elected under ORS 308.411(2)[1] to have its sawmill property in Grant County valued for assessment purposes without taking into consideration functional or economic obsolescence. This election permitted taxpayer to

---

[1] All references to the Oregon Revised Statutes are to 1993.

decline disclosing its operating income and expense information to the assessor. The assessor placed an "elected value" on the roll and taxpayer appealed that value to the Department of Revenue (department). After a hearing, the department found in taxpayer's favor, and Grant County appealed to this court.

## FACTS

The subject property consists of two separate sawmills on a 41.56 acre site in Prairie City. When taxpayer purchased the property in 1976 there was only one mill, referred to by the parties as the large log mill. This mill was built in the 1960's and was not operational at the time of purchase. However, it was made operational and has had some periodic upgrades since that time. As of the assessment date, taxpayer's appraiser described the mill as:

> "[C]omprised of a Rosserhead debarker, a double cut vertical bandmill with carriage, a double pocket edger, and sorter/stacker. Several assets in the mill have been bypassed and are no longer utilized, including an edger, two resaws, a trimmer, and a drop sorter. The planer line associated with the large log mill has also been abandoned in place. The mill utilizes older technology equipment and processes."

The large log mill produces dimensional lumber of various sizes and has a capacity of 100,000 board feet per shift. However, due to an inadequate supply of large logs, the assets have only operated approximately 30 percent to 40 percent of the time since 1992.

Taxpayers constructed a separate small log or stud mill in 1978. Taxpayer's appraiser indicates:

> "Major items of production machinery in the stud mill (Mill #2) consist of a Nicholson debarker, Optimil sharp chain log transfer system, Salem quad bandmill, optimized board and gang edgers, and two automatic lumber stackers. The stud mill facility utilizes state-or-the-art optimized technology in the production process."

The stud mill produces 2 x 4's, 2 x 6's, 1 x 4's, and 2 x 3's. It has a productive capacity of 150,000 board feet per shift and usually operates two shifts per day. Although the

two mills are separate, including separate planers, they share the use of seven dry kilns. Taxpayer's appraisal report states:

> "In addition to these production processes, the facility also includes a boiler (used only for back-up purposes on a very limited basis), storage buildings, a strapping shed, maintenance facility, office building, truck scale, and related support equipment."

Although the site is close to Prairie City, it has no rail access. Taxpayer trucks its products 65 miles to a railcar loading facility in Baker City, which is a significant locational disadvantage.

■ It is essential to understand the law applicable to this case. ORS 308.408 through ORS 308.413 allows the owner of an industrial plant to avoid disclosing its operating income and expenses to the tax authorities. This advantage is obtained only by electing to have the plant valued under certain restraints which may result in an assessed value higher than real market value. The specific statutory provision, ORS 308.411(2), reads:

> "The owner of a plant may elect to have the plant appraised and valued for ad valorem tax purposes excluding the income approach to valuation and excluding taking into consideration functional and economic obsolescence in the utilization of any approach to valuation."

■■ If no consideration can be given to functional or economic obsolescence, then the elected value may be higher than true cash value or real market value. *See J. R. Simplot Co. v. Dept. of Rev.*, 321 Or 253, 897 P2d 316 (1995). By excluding use of the income approach and allowing only for physical depreciation, the "elected value" of an industrial plant which does suffer from functional and economic obsolescence *will* exceed real market value.[2]

Plaintiff's expert witness, James Bennett, is an appraiser employed by the department. He has many years experience in appraising timber and is familiar with the

---

[2] This is significant given taxpayer's appraiser's misunderstanding of "elected value" and "real market value," which will be discussed below.

wood processing industry. However, he has limited experience as an industrial appraiser.

■ Bennett used the reproduction cost new approach (RCN). In theory, this approach seeks to determine the cost of reproducing the plant exactly as it existed on the assessment date. Often, this is not possible because many of the machines are so old prices are not available. Consequently, the appraiser must use a replacement cost new (RpCN) and adjust for differences due to changes in technology. In at least one instance, Bennett resorted to the cost of a used machine. He used a commercial cost factor service to estimate the cost of the buildings and structures. Because this service is updated, it implicitly introduces some degree of replacement instead of reproduction. However, overall the witness tried to remain as true to reproduction cost as possible. Based on his listings and information, he determined that the RCN was $12,042,130.

Bennett estimated physical depreciation by observation of the appearance and condition of the property, considering type of construction, age, and probable life expectancies. His report indicated that he "formed overall impressions of the physical condition of the various sections of the mill." He interviewed the plant manager and other personnel to learn of problems, maintenance policies, and operations. His impression was that the large log mill was old but functioned smoothly. The stud mill appeared up-to-date and used modern technology.

Bennett was trained to estimate the physical condition of property based on the following scale: 90-100 percent, new or excellent; 80-90 percent, very good; 60-80 percent, good; 40-60 percent, fair; 30-40 percent, useable; 20-30 percent, poor; and 15-20 percent scrap. This scale was based on similar scales such as that found in Exhibit 5, page 63.

The appraiser indicated in his report that "[a]ccording to plant management, the machinery would last indefinitely at the current levels of maintenance." Overall, the appraiser found that the older areas of the mill generally had at least 30 percent remaining life and the newer areas even more. The stud mill, which had a RCN of $4,624,830, was adjudged 71 percent good, or a depreciated reproduction cost

of $3,296,700. Bennett was impressed that the Optimil system installed in 1992, two years before the assessment date, was modern technology and cost $2,193,005 new to install.

Bennett found that the large log mill was 37 percent good, the dry kilns 42 percent good, the planer 40 percent good, and the chipping system 50 percent good. He estimated buildings and structures as 43.7 percent good. His total depreciated reproduction cost for both mills was $6,358,160. On an overall scale, this indicates that the improvements were considered 52.8 percent good or 47.2 percent physically depreciated.

Bennett also considered a sales comparison analysis but he found "too many unquantifiable estimates and adjustments." Concluding that the sales comparison approach was not a reliable indicator of value, he placed no weight upon it. Therefore, based on the RCN approach, his opinion of the elected value for the subject property under ORS 308.411(2) was $6,358,160 as of July 1, 1993. However, because the assessment date in question is July 1, 1994, that value was adjusted for trending, depreciation, and changes in the property, resulting in a elected value of $6,094,050 as of July 1, 1994.

Taxpayer's appraiser, Larry Tapanen, is very experienced and heads a large appraisal firm. He has over 35 years of experience in the wood products industry. His engineering degree and other education makes him eminently qualified to estimate the cost and condition of the subject property. Unfortunately, he spent only two hours in the plant. The listing of the machinery and equipment and observation of its condition was performed by a person no longer employed by his firm. However, from taxpayer's point-of-view this is not significant because Tapanen did not rely upon observed physical depreciation. Rather, his estimates of physical condition are important only in providing a basis for comparing the subject property with other sawmills. He believes the market is the best judge of physical deterioration and relied upon his analysis of market sales to measure depreciation.

Tapanen estimated the reproduction cost new at $15,300,000. He observed that constructing the subject

improvements as two separate mills incurred extra capital costs. He indicated that a modern, up-to-date design would combine at least the primary breakdown equipment. This could achieve a 50 percent reduction in the cost of conveyors and transfers in the large log mill and would only increase the stud mill building 50 percent in size. Based on that change alone, he estimated the replacement cost new could be reduced to $12,895,000. This indicates there is functional obsolescence of $2,109,000 associated with the layout and design of the plant.

■ Rather than rely upon observed estimates of physical deterioration, Tapanen sought to use market data to quantify physical depreciation. However, sale prices of comparable mills reflect all forms of depreciation. To comply with the mandate of ORS 308.411, an appraiser must identify functional obsolescence and economic obsolescence and add those forms of obsolescence back to the sales price of the comparable sale.

■ Economic obsolescence, or external obsolescence, is a form of depreciation or loss in value caused by conditions outside the property. *See The Appraisal of Real Estate*, 358 (10th ed 1992). Tapanen considered governmental restrictions on the sale of publicly owned timber as the major source of quantifiable external obsolescence. The spotted owl was placed on the Endangered Species List in 1990. In 1991, to protect the habitat of the spotted owl, a federal court issued an injunction prohibiting the harvest of timber on certain public lands. Tapanen found that these events had a major impact on the forest products industry. He compared sales of wood products plants before 1991 with sales occurring after 1991. Based on his analysis of six sales before 1991 and 21 sales after 1991, he concluded that there had been a 36 percent decrease in price due to the spotted owl. Although Tapanen considered other factors such as lumber prices, competitive pressures, and insect infestations, he concluded that these were part of the normal business cycle. He therefore found there was economic obsolescence of 36 percent.

■ Functional obsolescence is a form of depreciation or loss in value due to defects in design, advances in technology,

materials or superadequacy. *See The Appraisal of Real Estate* at 352. A clear example of functional obsolescence in this case is where an older headrig or saw carriage system, which is manually operated and relies upon the judgment and skill of the sawyer, is replaced by a laser-guided computerized system such as the Optimil system installed in the stud mill.

Tapanen's final step in his seven-step process of quantifying economic obsolescence was to compare the sales prices of comparable mills with the RCN of those mills. He considered the comparable mills from four different perspectives, looking for the closest match with regard to: (1) RCN, (2) capacity, (3) appraisal date, and (4) functional comparability. These comparisons gave him a ratio of sale price to RCN. Based on a range of 8.0 to 15.0, he selected 14 percent as the appropriate ratio between sales price or market value and RCN. Multiplying his RCN for the subject property of $15,300,000 by 14 percent gave him an indicated value by the cost approach of $2,100,000. His appraisal report states: *"It is important to note that this conclusion includes both economic and functional obsolescences."* (Emphasis in original.)

In his sales comparison approach, Tapanen found some 70 sales spread over Montana, Washington, Idaho, Oregon, and California. He selected and analyzed 27 sales in terms of productive capacity, comparing both price per capacity and RCN per capacity. He adjusted the comparable sales with regard to processing machinery, indicating whether they had planing, drying, cogeneration or remanufacturing facilities. He also adjusted for technology differences. These adjustments were based on the appraiser's judgments, but were necessary to compare the sales to the subject. After these adjustments, he found that sales #14, #36, and #39 were the most comparable. These sales gave him a range of value indicators of $12.80 per board foot (BF) to $13.59 per BF of productive capacity. He selected $13.50 per BF as the most appropriate market indicator of value for the subject property. Multiplying $13.50 by the subject's 250,000 board foot capacity gave him an indicated value by the sales comparison approach of $3,375,000. In reconciling his RCN approach and his sales comparison approach, Tapanen

placed the greatest reliance upon the sales comparison approach. His opinion of the "elected" value of the subject property as of July 1, 1994, was $3,300,000.

## ANALYSIS

Plaintiff (county) has the burden of proof. Its RCN of $12,042,130 can hardly be disputed by taxpayer since taxpayer's RCN is $15,300,000. However, taxpayer does dispute the county's 47.2 percent overall physical depreciation. Taxpayer properly points out the weaknesses of the "observed physical depreciation" approach. No appraiser is Superman with x-ray vision to see whether enclosed bearings, bushings, gears, and chains are worn. With industrial machinery, some parts wear out rapidly and some last for many years. Typically, worn parts are replaced and machinery in a system such as a wood processing plant is maintained to operate without significant down time. Although machinery and equipment may be old, its physical condition might be relatively good if parts have been replaced. For example, in the large log mill undoubtedly some of the conveyors have been replaced several times. As of the assessment date, one conveyor might be almost new and another almost worn out. Consequently, the method of estimating physical depreciation by observation leaves much to be desired.

■■ It is important to note that under ORS 308.411, the court can only allow for physical deterioration. Older equipment in a wood products plant might be outdated but not physically worn. Also, equipment which is larger than necessary, such as the large log mill six-foot bandsaw, constitutes excess capacity. To the extent that older machinery is slower, heavier, requires more manual labor, produces greater waste, consumes more energy or in other ways is not as good as a modern piece of machinery, the loss in value due to such causes is attributable to functional obsolescence, not physical depreciation.

The court has concerns with taxpayer's appraisal. It does not apply appraisal theory consistently with the restraints imposed by ORS 308.411(2). For example, in the very beginning of the appraisal report a footnote states:

"For purposes of this analysis, Real Market Value is considered to be synonymous with 'elected value.' While elected value discretely excludes functional and economic considerations under Oregon Revised Statute 308.411(2), Real Market Value is suppose[d] to consider all forms of depreciation. In this particular instance, however, pursuant to the conclusions of the Oregon Supreme Court in the *Department of Revenue v. Simplot* case, we have concluded that the two value premises are equivalent."

Real market value can be equivalent to the elected value under ORS 308.411 only when the subject property contains *no* functional obsolescence or economic obsolescence. In *Simplot*, the parties agreed that the property was a "state-of-the-art plant suffering essentially no economic or functional obsolescence." *See Simplot*, 321 Or at 263.

There can be no doubt that the subject property suffers from both significant functional obsolescence and economic obsolescence. Tapanen found that the subject property suffers 36 percent economic obsolescence. He acknowledges that the large log mill uses older technology. He points out in his appraisal report that:

"Several assets in the mill have been bypassed and are no longer utilized, including 'an edger, two resaws, a trimmer,. and a drop sorter.' The planer line associated with the large log mill has also been abandoned in place. The mill utilizes older technology equipment and processes."

Also, he testified that the laser-guided Optimil system in the stud mill was not state-of-the-art when it was installed. In fact, he views the stud mill as being affected by both economic and functional obsolescence. This all suggests major functional obsolescence as well as economic obsolescence. In light of this evidence, the elected value under ORS 308.411(2) cannot be equivalent to real market value.

Tapanen performed a cost approach by listing and estimating the RCN of the subject plant at $15,003,000. This estimate appears reasonable. He also found functional obsolescence in the design of the separate mills amounting to $2,109,000, which also appears reasonable. He then calculated economic obsolescence from market sales. These latter calculations may be reasonable, but the court considers the

method weak. The primary weakness lies in the unaccounted for differences between the comparable sales and the subject property. Tapanen determined the ratio between the sales price and the RCN of his comparable sales. This provided a range of ratios of 3.45 percent to 17.93 percent (unadjusted). However, his analysis does not make adjustments for age, location, layout, and other differences. For example, the subject lacks rail access, a potential source of economic obsolescence that may or may not apply to the comparable sales.

The main weakness in Tapanen's cost approach is that he does not calculate or separately consider functional obsolescence. The seventh step in his process of calculating economic obsolescence merely compares sale prices to RCN. However, this simple comparison reflects all forms of obsolescence. He did nothing to add back economic or functional obsolescence. As a consequence, the 14 percent, if it represents anything, represents real market value, not elected value.

Tapanen cites Kinzua Mill, his comparable sale #36 as supporting his position. He indicates that the Kinzua Mill was a "newly remodeled mill utilizing the latest technology with no known functional problems." He states "[a]s such, the 14 percent factor is reflective of a sawmill with no functional problems." If the latter statement is true, then the 14 percent cannot apply to the subject mill, which taxpayer's own evidence shows suffers from significant functional obsolescence.

Tapanen's cost approach indicates that the subject property is 86 percent physically deteriorated. He believes that high usage in the wood products industry wears property very rapidly, that metal fatigues and it cannot be restored to anything close to its new condition. In addition to the fact that this perspective exaggerates physical deterioration, it is unreasonable in proportion to this case. If the subject property is 86 percent physically deteriorated, then all of the functional obsolescence and economic obsolescence must be found in the remaining 14 percent. In light of the evidence concerning the extent of both forms of obsolescence, that is not reasonable.

Tapanen testified that if the large log mill were liquidated, then the taxpayer would realize zero value. The

court does not disagree with Tapanen's estimate of zero liquidation value. However, the evidence suggests that the cause of the zero liquidation value would be as much economic and functional obsolescence as physical condition. Likewise, Tapanen's view suggests that the relatively new Optimil system must have a physical life of no more than three to four years. In light of the evidence concerning its cost and performance, this seems unreasonable.

 Tapanen's comparable sales approach fairs no better. He considered 27 comparable sales in various perspectives and adjusted those sales for economic obsolescence. He also adjusted the sales to make them comparable to the subject. Theoretically, if a mill which is exactly like the subject sold in the open market, then its sale price would indicate the market value of the subject mill. Unless economic and functional obsolescence are expressly added back, these comparisons do not result in an "elected value" required by ORS 308.411. The sales comparison approach cannot be used unless the appraiser has some way of "adding back the portion of the valuation attributable to functional or economic obsolescence in the comparable plants." *Simplot*, 321 Or at 265. Determining a market price per board foot of productive capacity does not result in an elected value where the subject property suffers from functional and economic obsolescence. As a result, the court cannot accept either of Tapanen's indications of value as the elected value under ORS 308.411.

The undisputed evidence in this case is that the subject mill is still in operation. The stud mill operates two shifts per day and produces approximately 150,000 BF per shift. There is nothing in the evidence to indicate that management expects major breakdowns or problems. In view of the improvements made, it is reasonable to conclude that the physical condition of that mill is anywhere from 50 to 70 percent good. Although the large log mill has also had improvements made to it, it is older and necessarily would have more wear and tear. Nevertheless, it is an operating mill. The court finds that Plaintiff's testimony is more reasonable in that an operating mill would be in better physical condition than 15 or 20 percent good.

There is no evidence to indicate that the buildings and structures suffer from any particular defects other than normal wear and functional and economic obsolescence. The photos submitted by taxpayer appear to confirm the Plaintiff's perspective rather than taxpayer's perspective. Based on all of the evidence, the court finds that the assessed value as required by ORS 308.411 is $6,094,050. This value is to be allocated to the two accounts as set forth in Plaintiff's Exhibit 1, at 34.

The court emphasizes that the value determination made by it is undoubtedly not real market value. The functional and economic obsolescence suffered by the subject property would indicate that its real market value is substantially less than $6,094,050. Nevertheless, the court notes that its determination of elected value is equivalent to $24.38 per BF of productive capacity. Tapanen's sales comparison sales approach considered sales with regard to location, time, age, mill type, and capacity, with ranges of $8.84 per BF to $54.08 per BF. A value for the subject property of $24.38 per BF of productive capacity is certainly within the range of real market value. The department's Opinion and Order No. 95-1827 must be set aside. Judgment will be entered in accordance with this opinion. Plaintiff to recover its costs and disbursements.